IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JONATHAN LYNN MCCART,

    Petitioner,                 No. CIV. S-04-0866 FCD EFB P

    vs.

A.A. LAMARQUE,

    Respondent.            <u>FINDINGS & RECOMMENDATIONS</u>

                                   /

        Petitioner, a state prisoner proceeding pro se, filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges the constitutionality of his 2001 convictions for assault, aggravated mayhem, torture, and making a criminal threat. Petitioner contends that (1) the state trial court erred in admitting certain expert testimony during his trial, (2) the trial court erred in denying a post-trial defense motion requesting juror identifying information, and (3) there was insufficient evidence to support his conviction for aggravated mayhem. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

        In 2001, a jury found petitioner guilty in Sacramento County Superior Court of two counts of assault, one count of aggravated mayhem, one count of torture, and one count of

making a criminal threat. Pet., P. & A. at 3. As a result, petitioner was sentenced to a state prison term of life with the possibility of parole on the mayhem conviction, to be served consecutively to an aggregate determinate term of four years and eight months. *Id*.

Petitioner appealed his convictions and sentence to the California Court of Appeal for the Third Appellate District. *Id*. at 4. On March 26, 2003, the appellate court denied petitioner relief and affirmed his convictions and sentence. *Id*. Petitioner then filed a petition for review in the California Supreme Court, which was denied on June 11, 2003. *Id.* Petitioner's federal habeas petition was received for filing by this court on April 30, 2004.

## FACTUAL BACKGROUND[1]

> The offenses [underlying petitioner's convictions] comprised two episodes of domestic violence. The victim was [petitioner]'s girlfriend, Paula H. (Paula).
>
> The first episode occurred in August 2000, and encompasses the convictions for simple assault and making a criminal threat. As Paula reported to a police officer, [petitioner] was armed with a knife and a sock full of batteries. [Petitioner] accused Paula of being unfaithful, demanded that she disrobe so he could see if she had been having sex, and threatened to kill her. During this encounter, [petitioner] pushed Paula, hit her with the sock of batteries, and poked her with the knife. The next day, Paula obtained a restraining order against [petitioner]. After seeing [petitioner] a week later, however, Paula had the order dismissed.
>
> The second episode occurred on October 9, 2000, and encompasses the remaining convictions against [petitioner]. Paula reported this episode to three individuals: to a police officer and to an emergency room physician on October 12, 2000; and to a domestic violence counselor with the district attorney's office on October 18, 2000.
>
> Paula summarized the October 9 episode by stating that [petitioner] "had set her on fire and beaten her with a bar." The episode unfolded as follows. She and [petitioner] had been driving in his car (a Toyota Tercel) on October 9 when he accused her of cheating on him. Fearing that [petitioner] would hit her, Paula told [petitioner] to stop the car. [Petitioner] did, and the two of them

---

[1] This factual background is taken from the unpublished opinion of the Third District Court of Appeal and is presumed correct. Ans., Ex. C at 2-4; *see* 28 U.S.C. § 2254(e)(1).

2

got out. The argument continued. [Petitioner] then removed a tire iron from the car and began striking Paula's abdomen and legs with it. Paula "agreed" to get back in the car.

Back in the car, [petitioner] threatened to kill Paula if she cheated on him. Then he reached behind the seat and grabbed a five-gallon gasoline container. He opened the container, "dumped gasoline" on Paula, and then lit a "torch lighter" with a "three or four inch[]" flame. Paula begged him to put the lighter away, and he put it in his pocket.

Shortly thereafter, however, [petitioner] again accused Paula of cheating, and he relit the lighter. Panicked, Paula tried to kick the lighter out of [petitioner's] hand. Her foot ignited, and the fire spread up her body. Paula jumped from the car and started running. [Petitioner] yelled for her to stop, drop and roll; she did, and the fire was extinguished. Paula told the domestic violence counselor that she feared that [petitioner] would hurt her more if she told the truth; she added that she did not think [petitioner] was intentionally trying to set her on fire but only trying to scare her.

[Petitioner] drove Paula to his mother's house, where he and Paula had been staying in the garage. [Petitioner] left Paula there. Paula remained with [petitioner's] mother for four days without receiving any professional medical care; Paula finally called her grandmother who took her to the hospital.

Paula sustained third-degree burns to her right arm and to her left leg and thigh, and she underwent skin graft surgery. The burns caused permanent scarring. Paula also had bruises on her abdomen and legs.

[Petitioner's] mother, meanwhile, retrieved the Toyota Tercel, which had been impounded, and threw all of its contents into a dumpster bin at her daughter's apartment. Previously, an investigating officer had found a gasoline container and a tire iron on the Tercel's back seat.

While [petitioner] was in custody during the legal proceedings in this matter, he and Paula wrote love letters to each other. Paula often rode with [petitioner's] mother to attend [petitioner's] court hearings. One evening, after the trial had begun and Paula was to resume the stand the next day, [petitioner's] mother visited him in jail. During that visit, [petitioner] held up a note which stated: "Tell her [i.e., Paula] she did great. Tell her to say she fought with Tina [petitioner's sister] on the 17th of August. Tell Paula to say bruises from October 9th came from rolling on the ground. Tell Tina to say she got in a fight with Paula on several occasions. Tell Paula it is okay to say I don't remember."

At trial, Paula testified that [petitioner] did not hit her or otherwise

3

physically abuse her in August 2000. She also denied that [petitioner] had hit her or intentionally caused her to be burned on October 9, 2000.

## DISCUSSION

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

Pursuant to 28 U.S.C. § 2254, a person in custody under a state court judgment may apply for a writ of habeas corpus "on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because petitioner filed his application for a writ after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d) (referenced herein as § 2254(d) or AEDPA); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

Under the "contrary to" clause of § 2254(d)(1), a writ may be granted if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause, a writ may be granted if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

////

4

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the last reasoned state court decision addressing the merits of the petitioner's claim. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). Here, the California Court of Appeal for the Third Appellate District issued a reasoned opinion addressing the merits of petitioner's claims; therefore, this court will review that opinion to determine whether petitioner is entitled to habeas relief. *See* Ans., Ex. C.

II. Petitioner's Claims

Petitioner claims he is entitled to federal habeas relief because (1) the state trial court erred in admitting expert witness testimony at his trial which stated that only two percent of all reports of crimes are false reports, (2) the trial court erred when it denied a post-trial defense motion requesting juror identifying information, which petitioner contends was needed to support his motion for a new trial based upon jury misconduct, and (3) there was insufficient evidence presented at petitioner's trial to support his conviction for aggravated mayhem. Pet. at 6, 7.

    A. Admission of Expert Testimony

Petitioner contends that the trial court's admission of prejudicial expert testimony by Dr. Linda Barnard, a marriage and family counselor, that only two percent of crime reports are falsely made, denied him his constitutional rights to a fair trial and due process of the law. Pet., P. & A. at 10. Petitioner argues that in light of Paula's trial testimony that effectively exonerated him, Dr. Barnard's testimony suggesting that Paula's initial reports about the incidents at issue were truthful (and therefore that her trial testimony was false) amounted to an inadmissible opinion regarding Paula's veracity and was extremely prejudicial. *Id*. at 11-13.

Respondent counters that Dr. Barnard's testimony was permissible since she used the two percent statistic, along with a statistic that 76 percent of women recant, to support her opinion that battered women commonly recant. Ans. at 8. Respondent further contends that because there was an overwhelming amount of evidence at trial corroborating Paula's initial accusations

5

against petitioner, the admission of Dr. Barnard's testimony was not so prejudicial as to render petitioner's trial fundamentally unfair. *Id*.

This claim by petitioner was rejected by the California Court of Appeal in a written decision on petitioner's direct appeal. The state appellate court explained its rejection of petitioner's claim as follows:

> At trial, Dr. Linda Barnard testified for the prosecution as an expert on battered women's syndrome and domestic violence. Dr. Barnard opined that it is common for a woman, who has been subjected to the kind of abusive relationship that Paula allegedly had been subjected to by [petitioner], to oppose the prosecution of the man, particularly if she is still in the relationship. Dr. Barnard based her opinion on an FBI statistical study that found that up to 76 percent of battered women recant or refuse to cooperate in the prosecution of their batterer.
>
> Over an unsuccessful defense objection for relevance, the prosecution also asked Dr. Barnard whether there was any correlation between the number of battered women who recant and the number of false reports. Dr. Barnard answered that only about 2 percent of people falsely report being victims of any kind of crime; so "the 76 percent of [battered] women to whom it really did happen . . . they have decided to change their story for other reasons, but not because it didn't happen." Dr. Barnard explained that battered women usually recant out of love or fear.
>
> [Petitioner] argues that Dr. Barnard's 2 percent testimony amounted to an assertion that the FBI had determined there was a 98 percent probability that Paula's initial claims were true. This was improper, [petitioner] maintains, because opinion testimony about the veracity of another witness's particular statement is inadmissible.
>
> However, as Dr. Barnard explained in her testimony, she could not express any opinion regarding Paula's veracity; she had provided only generalized expert testimony regarding battered women's syndrome and domestic violence. Thus, the issue of Paula's veracity was properly left to the jury. Dr. Barnard used her expert knowledge of the 76 percent recant figure to opine that it is common for battered women to recant; and she used her expert knowledge of the 2 percent false report figure in explaining why battered women commonly recant – they are in love or they are in fear, but they have not lied initially.
>
> Thus, Dr. Barnard used the 76 percent and the 2 percent figures to support her opinion that battered women commonly recant. An expert may base her opinions on any "matter" known to her,

6

including otherwise inadmissible evidence, so long as it "reasonably may be relied upon" for that purpose. An expert may also testify about these matters in order to explain the reasons for her opinions. Admissibility disputes in this area are left to the trial court's sound discretion. We cannot say the trial court abused its discretion in admitting Dr. Barnard's 2 percent testimony.

Even if we were to assume the trial court erred in admitting the 2 percent testimony, the error was harmless. It is not reasonably probable that [petitioner] would have fared any better had the 2 percent testimony been excluded.

Paula reported the August and the October attacks in detail to authorities soon after those incidents happened. In fact, she reported the October incident on three occasions – to a police officer, to an emergency room physician, and to a domestic violence counselor; and these three reports were consistent.

The two attacks shared a common theme of jealous rage, and Paula carries with her the permanent emblems of the October mayhem encounter. After the October incident, [petitioner] took Paula to his mother's house, apparently isolating her there. More damning to [petitioner], while he was in custody on the present charges, he displayed a note to his visiting mother that sought to manipulate the trial testimony of Paula and his sister.

[Petitioner's] mother's conduct was also askew. She directed more of her attention to [petitioner's] impounded Toyota Tercel than she did to Paula's medical care; of course the investigating officer had previously found a gasoline container and a tire in the Tercel's backseat. [Petitioner's] mother, conveniently, threw out the Tercel's contents in a dumpster bin at her daughter's apartment complex.

Finally, Paula's exculpatory trial testimony was simply not credible. She and [petitioner] had reconciled, which Dr. Barnard previously explained is one of the main reasons for recanting. Paula had previously recanted regarding [petitioner], by dismissing the restraining order following the August incident. And much of her trial testimony was a tough sell. For example, here's how she explained the October incident: she and [petitioner] were parked in the Toyota smoking methamphetamine and using a torch lighter when she suddenly noticed a five-gallon gas can between her legs.

Ans., Ex. C at 5-8 (internal citations omitted).

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

7

process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van De Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). A federal court cannot disturb a state court's decision to admit evidence on due process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it rendered the trial fundamentally unfair." *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986); *see also Mancuso v. Olivarez*, 292 F.3d 939, 956 (2002) ("A writ of habeas corpus will be granted for an erroneous admission of evidence only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)). In addition, in order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001). Therefore, in order to grant relief, the habeas court must find that the error had "'a substantial and injurious effect' on the verdict." *Brecht*, 507 U.S. at 623.

As noted by the state appellate court, Dr. Barnard's testimony that only two percent of crime reports are false reports did not constitute an impermissible opinion regarding Paula's veracity. To the contrary, Dr. Barnard explained that she could not express an opinion about whether Paula's initial crime reports were true or false. Ans., Ex. C at 6. Dr. Barnard provided the statistic regarding the percentage of reports which are falsely made in response to an inquiry from the prosecution about whether there was a correlation between the number of battered women who recant and the number of false crime reports made. *Id.* at 5. Specifically, as the appellate court noted, "Dr. Barnard used her expert knowledge of the 76 percent recant figure to opine that it is common for battered women to recant; and she used her expert knowledge of the 2 percent false report figure in explaining why battered women commonly recant – they are in love or they are in fear, but they have not lied initially." *Id.* at 6. Dr. Barnard specifically did not, however, express an opinion as to Paul's veracity. Accordingly, nothing in the record suggests that the trial court erred in admitting Dr. Barnard's testimony regarding the percentage

8

of crime reports that are falsely made.

Moreover, even if the trial court's admission of Dr. Barnard's testimony was erroneous, admission of the evidence was neither arbitrary nor so prejudicial that it rendered the trial fundamentally unfair. In fact, as the state appellate court explained, the trial court's admission of Dr. Barnard's testimony was harmless. Because there was significant evidence at trial from which the jury could have inferred that Paula's initial reports about petitioner's crimes were true, the court's admission of Dr. Barnard's testimony did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. For example, as the state appellate court acknowledged, evidence was presented at trial that Paula provided consistent, detailed reports to authorities about each of the attacks at issue soon after those attacks happened. Evidence was also presented that the two attacks shared a common theme of jealous rage, and the jury was able to see Paula's physical scars from the October attack. Additionally, Paula's potentially exculpatory trial testimony lacked credibility since she and petitioner had reconciled by the time of the trial (and Dr. Barnard indicated that reconciliation is often a main reason why battered women recant), Paula had previously recanted regarding petitioner (when she dismissed the restraining order she had against petitioner after the August attack), and much of her trial testimony was too far-fetched to be believable (including testimony that she was smoking methamphetamine with petitioner when she just happened to notice that a large can of gasoline was sitting between her legs).

Therefore, the decision of the California Court of Appeal with respect to this claim was not contrary to or an unreasonable application of United States Supreme Court authority, nor was it based on an unreasonable determination of the facts. Accordingly, petitioner is not entitled to habeas relief on this ground.

////

////

////

9

B. <u>Denial of Request for Juror Identifying Information</u>

Petitioner argues that the state trial court's denial of his motion for access to juror identifying information without conducting a hearing violated his constitutional rights to a fair trial and due process of the law. Pet., P. & A. at 14. Petitioner's post-trial counsel filed the request for juror identifying information after obtaining information from petitioner's trial counsel that an investigator had spoken with several jurors after they were discharged and one or more jurors indicated that they were frustrated by petitioner's failure to testify at his criminal trial and considered the failure an indication of his guilt. *Id*. at 14. According to petitioner, his post-trial counsel sought the juror identifying information so that he could evaluate the investigator's claims and determine whether he could establish jury misconduct in petitioner's motion for a new trial. Petitioner contends that the trial court erred in denying petitioner access to juror information. *Id*. at 17.

According to respondent, however, petitioner's complaint in this regard does not amount to a violation of federal law and therefore federal habeas relief is not available to him. Ans. at 11. Respondent further argues that even if the claim is cognizable in a federal habeas petition, it still fails because petitioner was required to show good cause in order to obtain juror identifying information, and did not do so. *Id*. at 12-14. Respondent notes that the declaration petitioner's post-trial counsel submitted as support for his motion for juror identifying information did not identify the jurors who allegedly made the statements regarding petitioner's failure to testify and did not identify the investigator who allegedly spoke with them. Respondent also notes that although petitioner's post-trial counsel initially intended to call the unidentified investigator as a witness at the hearing on the motion, he ultimately declined to present any further evidence on the issue. *Id*. at 13.

////

////

////

In considering the merits of this claim by petitioner, the state appellate court stated:

> [California] Code of Civil Procedure sections 206 and 237 govern the release of juror identifying information . . . . Section 206, subdivision (g), states: "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. The court shall consider all requests for personal juror identifying information pursuant to Section 237."
>
> Section 237, subdivision (b), provides as relevant: "Any person may petition the court for access to [personal juror identifying information]. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. . . ."
>
> Thus, a defendant is entitled to a full hearing to obtain juror identifying information only if he first presents a petition that establishes good cause for the information. To establish good cause, a defendant must set forth a sufficient showing to support a reasonable belief that jury misconduct occurred. We overturn the trial court's ruling on this issue only if it abused its discretion.
>
> As the sole evidence supporting his motion for juror information, [petitioner] submitted a declaration from his new (posttrial) counsel, stating as pertinent: ". . . I was contacted by defendant's former counsel [trial counsel], James Worden, and advised that his review of his personal files [] had revealed notes or other information from an investigator who had been present at the time the jury was discharged. According to this investigator, one or more jurors indicated that they were frustrated by defendant's failure to testify, and that they considered the failure an indication of his guilt."
>
> The prosecutor who tried the case also submitted a declaration. He spoke with the jurors and was present while they spoke to the defense investigator. According to the prosecutor's declaration, each juror stated to the investigator that he or she had followed the trial court's instructions and that defendant's failure to testify was not used against him in reaching the verdicts.

11

> Defense counsel had previously told the court that he was thinking of having the investigator testify "about his [the investigator's] observations in the hallway so that we can put that to rest one way or the other." Nonetheless, at the threshold hearing on the motion, he submitted on the moving papers.
>
> The trial court did not abuse its discretion in denying this motion at the threshold stage and refusing to set it for a full hearing. Defendant failed to establish good cause because he failed to set forth a sufficient showing to support a reasonable belief that juror misconduct had occurred. Defense counsel's declaration failed to identify the investigator, failed to identify in any way the jurors at issue, and was based on double hearsay involving defendant's former counsel, James Worden. Defendant did not have the investigator or Worden submit a declaration. Furthermore, the prosecutor, who tried the case and was present while the jurors spoke with the investigator, directly contradicted defense counsel's declaration. Finally, although defense counsel initially though he might have the investigator testify at the hearing on the motion "about [the investigator's] observations in the hallway so that [that issue could be put] to rest one way or the other," counsel submitted the matter only on the moving papers.

Ans, Ex. C at 8-11 (internal citations omitted).

Petitioner contends that the state trial court denied his rights to due process and a fair trial when it denied him access to information needed to prove his claim for juror misconduct. Pet., P. & A. at 14. Petitioner does not identify, however, clearly established Supreme Court authority supporting the proposition that due process and/or the right to a fair trial requires a state trial court to provide criminal defendants with juror identifying information or to hold a hearing on a motion for disclosure of such information. *See, e.g., Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003), *cert. denied*, 543 U.S. 864 (2004) ("Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias [or misconduct] is raised."). Rather, petitioner contends that the state trial court violated California law (specifically, California Code of Civil Procedure sections 206 and 237) when it failed to hold a hearing on petitioner's motion for disclosure of juror identifying information. Pet., P. & A. at 15.

////

12

"Under California law, a defendant is entitled to a hearing to obtain juror identifying information only if he first presents a petition that establishes good cause for the information." *Feiger v. Hickman*, 2008 WL 1787416, at *7 (S.D. Cal. Apr. 16, 2008) (citing Cal. Civ. Proc. Code § 237 and *People v. Jefflo*, 63 Cal.App.4th 1314, 1318-23, n.8 (1998)). But the court does not need to set the matter for a hearing if the petition and declaration fail to establish a prima facie showing of good cause for the release of juror information or if there exists "a compelling interest against disclosure." Cal. Civ. Proc. Code § 237(b), (d). "To establish good cause a defendant must set forth a sufficient showing to support a reasonable belief that jury misconduct occurred." *Feiger*, 2008 WL 1787416, at *7 (citing *People v. Jones,* 17 Cal.4th 279, 317 (1998) and *Jefflo*, 63 Cal.App.4th at 1321-22, n.8).

Federal habeas corpus relief "does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see also Dugger v. Adams*, 489 U.S. 401, 409 (1989) ("[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution."); *Pulley*, 465 U.S. at 41 ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."). Nonetheless, the state trial court did not err in concluding that good cause did not support petitioner's motion for juror identifying information since he failed to set forth a sufficient showing to support a reasonable belief that jury misconduct occurred. Petitioner's only evidence in support of his motion was a declaration from petitioner's post-trial counsel stating that he had heard from defendant's trial counsel that a review of his personal files revealed notes from an investigator indicating that one or more jurors were frustrated by petitioner's failure to testify at trial and considered it an indication of petitioner's guilt. The reliability of the declaration was questionable in that it relied on multiple layers of hearsay and was directly contradicted by a declaration offered by the prosecutor who had been present at trial and who had been present at the time the jurors spoke to the investigator. According to the prosecutor's declaration, each juror stated to the investigator that he or she had followed the trial

court's instructions and that petitioner's failure to testify was not used against him in reaching the verdicts. Petitioner's post-trial counsel did not offer a declaration from petitioner's trial counsel or from the investigator, did not reveal the identity of the investigator, and did not reveal which juror or jurors (or even how many) made the statements at issue. In fact, although petitioner's post-trial counsel stated that he intended to call the investigator to testify at the hearing, he ultimately declined to present any further evidence and instead submitted the matter on the moving papers.

However, even if the state trial court erred in failing to hold a hearing on petitioner's motion for disclosure of juror identifying information, such error was harmless because, as noted above, it is likely no new evidence would have been presented at the hearing. Such error (and/or any error in denying petitioner's motion) was also harmless because pursuant to Federal Rule of Evidence 606(b), evidence that one or more jurors considered petitioner's failure to testify at trial during their deliberations would have been inadmissible to impeach petitioner's verdict in his motion for a new trial.[2] Fed. R. Evid. 606(b); *United States v. Rutherford*, 371 F.3d 634, 639-40 (9th Cir. 2004) ("Fed. R. Evid. 606(b) bars [a] juror's testimony as to 'any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.' There are two exceptions: a juror may testify as to whether (1) 'extraneous prejudicial information was improperly brought to the jury's attention' or (2) whether 'any outside influence was improperly brought to bear upon any juror.' . . . Here, . . . the jurors learned of Mrs. Rutherford's failure to testify through their personal observations during trial, not through a prohibited route or improper ex parte contact. Under these circumstances, the district court did not err in concluding

---

[2] The Federal Rules of Evidence apply to habeas corpus proceedings to the extent that the habeas statutes themselves provide no different rule of evidence. Fed. R. Evid. 1101(e). There is no habeas evidentiary rule on the subject.

14

that testimony regarding Mrs. Rutherford's absence from the witness stand is inadmissible under Rule 606(b) because . . . it does not concern facts bearing on extraneous or outside influences on the deliberation.").

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). When the jury breaches this duty by considering extraneous facts not introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995). "Evidence not presented at trial . . . is deemed 'extrinsic.'" *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (citing *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987)). However, the fact that petitioner did not testify in his own defense is not extrinsic evidence. *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) (citing *United States v. Rodriquez*, 116 F.3d 1225, 1226-27 (8th Cir. 1997)). Although the jury's discussion of petitioner's failure to testify may have violated the trial court's instructions, "what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it [and the court] may not inquire into a jury's deliberations concerning the evidence at trial." *Raley*, 470 F.3d at 803.

It appears that the juror misconduct claim that petitioner wanted to investigate and potentially include in his motion for a new trial would have been based on the statements of jurors regarding their thought processes and what occurred during jury deliberations. Those statements could not be considered for the purpose of challenging the verdict in his case. Such evidence does not fall within the stated exceptions to Rule 606(b). The fact that petitioner did not testify was obvious to all jurors from the trial itself. It was not new or extraneous information and it did not come from outside influences. Rather, the juror statements petitioner would likely have sought to investigate and then address in his motion for a new trial would have

concerned the arguments, discussions, reactions, or mental thought processes of the jurors. The only use that the testimony could serve would be to demonstrate that these discussions affected the deliberative process. Pursuant to Rule 606(b), such evidence is inadmissible to impeach a verdict. Therefore, petitioner's inability to access juror identifying information to formulate a potential claim for jury misconduct was harmless.[3]

Because petitioner has not established that the state appellate court's decision upholding the trial court's denial without a hearing of petitioner's motion for disclosure of juror identifying information was contrary to or involved an unreasonable application of federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence, petitioner is not entitled to relief on this claim.

C. Insufficient Evidence to Support Aggravated Mayhem Conviction

Finally, petitioner contends that because there is no evidence that he intended to cause Paula permanent disability or disfigurement, his conviction for aggravated mayhem was not supported by sufficient evidence and therefore violated his constitutional right to due process. Pet., P. & A. at 20. Respondent counters that there was more than sufficient evidence from which the jury could infer that petitioner had the necessary intent. Ans. at 15-16.

In rejecting petitioner's claim, the state appellate court reasoned:

> In reviewing the sufficiency of the evidence in a criminal appeal, we must review the whole record in the light most favorable to the judgment and determine whether any rationale trier of fact could have found the challenged elements beyond a reasonable doubt.

---

[3] Petitioner's current habeas petition does not actually allege juror misconduct; instead, petitioner challenges the trial court's denial without a hearing of petitioner's motion for disclosure of juror identifying information (so that petitioner could investigate whether there was jury misconduct). Nonetheless, if petitioner were alleging jury misconduct herein (based on the evidence set forth in the declaration of petitioner's post-trial counsel), petitioner would have to show that the alleged error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting *Brecht*, 507 U.S. at 637). Given the significant amount of evidence presented at trial suggesting petitioner's guilt, and given the reasons set forth herein regarding the harmlessness of the trial court's ruling, petitioner would be unable to show that the alleged juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict."

16

Under the relevant part of the statute defining aggravated mayhem, section 205, "[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being . . . ."

Aggravated mayhem is a specific intent crime. It requires proof that the defendant specifically intended to cause the maiming injury, that is, the permanent disability or disfigurement. "[S]pecific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors." The evidence is insufficient to prove a specific intent to maim where it shows no more than an "indiscriminate" or "random" attack, or an "explosion of violence," upon the victim. But evidence of a "directed and controlled" attack, an attack of "focused or limited scope," may provide substantial evidence of such an intent.

There is sufficient evidence that defendant specifically intended to cause the permanent, disfiguring burns that Paula sustained. While in the confines of the front seat of a small car, defendant, in a fit of jealousy and having just threatened to kill Paula, reached behind the seat and grabbed a five-gallon gas container. He opened the container and proceeded to dump gasoline on Paula. He then fired up a "torch lighter" with a "three or four inch[]" flame, placing it close to Paula. Paula begged him to put the lighter away, and he did so for a moment. Then defendant again accused Paula of cheating on him, and he took the "torch" from his pocket and relit it. Defendant's actions prompted panic in Paula. She tried to kick the lighter out of his hand, and the fire and third-degree burns ensued.

This was no indiscriminate or random attack, or explosion of violence. This was a calculated, directed and controlled attack with a focused scope. To dump gasoline on another human being while in the confines of a small car, and then to ignite a three- or four-inch flame next to her gas-soaked body, not once but twice, evidences a specific intent to cause disfiguring burn injuries. Defendant literally, figuratively, and intentionally was playing with fire, and Paula got severely burned as a result.

Pointing to Paula's kick, defendant argues the evidence is insufficient that he deliberately lit Paula on fire. The statute defining aggravated mayhem states that a person must "intentionally cause[]" permanent disability or disfigurement. There is sufficient evidence that defendant intentionally caused Paula's disfiguring burns. Defendant deliberately dumped gasoline on Paula while in the confines of a small car and then twice deliberately lit a three- or four-inch flame next to her gas-

17

> soaked body. Paula's panicked kick was prompted by defendant's deliberate actions in carrying out the burning. Substantial evidence shows that Paula believed defendant was in the process of burning her, and her panicked kick was a last-ditch attempt to thwart that process. As Paula summarized the October 9 burning in her interview with a police officer, defendant "had set her on fire[.]" (It is true that Paula told the domestic violence counselor that she did not think defendant was intentionally trying to set her on fire, but only trying to scare her. Paula also told the counselor, however, that she feared defendant would hurt her more if she told the truth.)
>
> We conclude the evidence is sufficient to support defendant's aggravated mayhem conviction.

Ans., Ex. C at 11-14 (internal citations omitted).

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.*

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987). It is

the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991); *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence from which a reasonable trier of fact could have found beyond a reasonable doubt that petitioner was guilty of aggravated mayhem. As the state appellate court explained, under California law, petitioner could not be found guilty of aggravated mayhem without a specific intent to cause Paula's permanent disability or disfigurement. Petitioner argues that there was no evidence that he had that specific intent; rather, the evidence presented at trial showed he only intended to frighten Paula. However, regardless of whether some evidence presented at trial suggested that petitioner only intended to frighten Paula, there was substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner intended to do more than just frighten her and that he actually intended to cause her permanent disability or disfigurement. While in the confines of the front seat of a small car, petitioner, "in a fit of jealousy and having just threatened to kill Paula," reached behind his seat, grabbed a five-gallon gas container, opened the container, and deliberately dumped gasoline on Paula. Ans., Ex. C at 12-13. Petitioner then twice lit a three or four inch flame and placed it close to Paula's gas-soaked body. Defendant's actions caused Paula to panic, so she tried to kick the lighter out of petitioner's hand and ended up receiving substantial third degree burns on her right arm, left leg, and left thigh. *Id.* at 13. As the appellate court noted, "[t]o dump gasoline on another human

1 being while in the confines of a small car, and then to ignite a three- or four-inch flame next to
2 her gas-soaked body, not once but twice, evidences a specific intent to cause disfiguring burn
3 injuries." *Id*. at 13.

4 Because there was sufficient evidence presented at trial to support petitioner's conviction
5 on the aggravated mayhem charge, the state appellate court's analysis of this claim was not
6 contrary to or an unreasonable application of federal law, nor was it based on an unreasonable
7 determination of the facts. Accordingly, petitioner is not entitled to habeas relief on this ground.

8 III.   Recommendations

9 For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's
10 application for a writ of habeas corpus be denied.

11 These findings and recommendations are submitted to the United States District Judge
12 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days
13 after being served with these findings and recommendations, any party may file written
14 objections with the court and serve a copy on all parties. Such a document should be captioned
15 "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections
16 within the specified time may waive the right to appeal the District Court's order. *Turner v.*
17 *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

18 DATED: March 31, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE